Thomas A. Brown II
Morea Schwartz Bradham Friedman & Brown LLP
444 Madison Avenue, 4th Floor
New York, New York 10022
Phone: (212) 695-8050
Email: tbrown@msbllp.com
*Attorneys for Plaintiff Equiom (Isle of Man)*
*Limited (as Trustee of the Lausar Settlement Trust)*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
-----------------------------------------------------------x
:
EQUIOM (ISLE OF MAN) LIMITED : Civil Action No. 2:16-CV-04362
(as Trustee of the Lausar Settlement Trust) :
:
Plaintiff, :
:
v. :
:
ROBERT JACOBS, COREY SINGMAN, : **JURY TRIAL DEMANDED**
ROBO ASSOCIATES LLC, and :
LLOYD HARBOR PARTNERS LLC : **VERIFIED COMPLAINT**
:
Defendants. :
:
-----------------------------------------------------------x

Plaintiff Equiom (Isle of Man) Limited (as Trustee of the Lausar Settlement Trust) ("Equiom"), by and through its undersigned attorneys, alleges for its Complaint against Defendants Robert Jacobs ("Jacobs"), Corey Singman ("Singman"), Robo Associates LLC ("Robo"), and Lloyd Harbor Partners LLC ("LHP") as follows:

**PRELIMINARY STATEMENT**

1. Equiom brings this action to recover $500,000, plus interest, for fraud, breach of fiduciary duty, aiding and abetting fraud, constructive trust, and unjust enrichment.

2. Equiom was induced to invest $500,000 into Metro Design USA, LLC ("Metro NJ"), a New Jersey limited liability company, because of Singman's misrepresentations. Singman was acting at the direction of Jacobs and his company Robo, who controlled Metro NJ.

1

3. Once Jacobs and Robo had secured Equiom's investment into Metro NJ, they used their control over Metro NJ to strip away all of its assets—including its licenses, customer relationships, and contracts. Those assets were transferred to another of Jacob and Robo's companies, LHP, for their benefit and to the detriment of Equiom.

## PARTIES, JURISDICTION, AND VENUE

4. Plaintiff Equiom is a global company organized under the laws of the Isle of Man, having a principal place of business at Jubilee Buildings, Victoria Street, Douglas, Isle of Man, 1M1 2SH. Equiom is a Trustee of the Lausar Settlement Trust and makes investments in that capacity.

5. Upon information and belief, Defendant Jacobs is a citizen and resident of Connecticut who regularly visited New Jersey in connection with Metro NJ.

6. Upon information and belief, Defendant Singman is a citizen and resident of New Jersey.

7. Upon information and belief, Defendant Robo is a Connecticut limited liability company controlled by Jacobs and having a principal place of business at 300 Wilson Avenue, South Norwalk, CT 06854. Upon information and belief, Jacobs operated through Robo during his regular visits to New Jersey in connection with Metro NJ.

8. Upon information and belief, Defendant LHP is a Delaware limited liability company controlled by Jacobs and having a principal place of business at 300 Wilson Avenue, South Norwalk, CT 06854. LHP was formerly known as Metro Design USA LLC ("Metro DE") and, upon information and belief, is presently in possession of assets taken from Metro NJ.

9. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332.

10. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2).

**FACTUAL BACKGROUND**

11. In or about 2007, Metro NJ was founded by two individuals, Warren Vogel ("Vogel") and Michael Coughlin ("Coughlin").

12. Metro NJ was a company that marketed and sold certain consumer goods to big-box retailers, including the RotoRooter brand plunger and Kaboom brand bathroom products.

13. By at least late 2014, Metro NJ was struggling to repay its debts to various creditors.

14. Metro NJ was controlled by its board of managers.

15. As demonstrated by the letter attached as Exhibit A, Jacobs and his company Robo obtained majority control over Metro NJ's board of managers by at least September 22, 2014.

16. Based on statements by Singman, Equiom had previously believed that at all times relevant to this action Metro NJ was controlled solely by its founders, Vogel and Coughlin. In actuality, Vogel and Coughlin were only nominal operators of the company. During the relevant timeframe, Jacobs and Robo were controlling Metro NJ via its board of managers.

17. Beginning by at least September 22, 2014, Jacobs and Robo exercised control over Metro NJ in many ways. For example:

   a. Jacobs and Robo directed the operations of Metro NJ;

   b. Jacobs and Robo dictated which debts and expenses Metro NJ paid; and

   c. Jacobs and Robo directed which investors could invest in Metro NJ and on what terms.

18. Furthermore, at the direction of Jacobs and Robo, Singman was retained to raise funds for Metro NJ.

19. Upon information and belief, Jacobs directed Singman to solicit funds from Equiom so that a transfer of Metro NJ's assets could be made to a different company that was also under the control of Jacobs and Robo.

20.     Upon information and belief, Jacobs encouraged Singman to solicit funds from Equiom to invest in Metro NJ by promising Singman a 10% finder's fee, among other potential remunerations.

21.     Upon information and belief, Singman agreed to solicit Equiom to invest funds in Metro NJ.

**SINGMAN, JACOBS, AND ROBO PERPETRATE A FRAUD ON EQUIOM**

22.     Singman contacted Equiom through an individual named Philip Scott ("Scott") starting on or about December 19, 2014 to entice Equiom to make an investment in Metro NJ.

23.     Essentially, Singman represented to Equiom that the investment would be used to strategically restructure Metro NJ's business and that, in return, Equiom would receive ownership rights in a restructured business with strong potential for growth.

24.     At the time, Equiom believed that Singman was locating valuable investments for Equiom and looking out for Equiom's best interests.  Equiom has since learned that Singman was actually acting for himself, Jacobs, and Robo.

25.     Most fundamentally, because of its debts and contractual commitments, it was impossible for Metro NJ's business to be restructured in the way that Singman was proposing to Equiom.  Singman knew this, and so did Jacobs and Robo.

26.     Moreover, Jacobs and Robo never intended to use their control over Metro NJ to honor the proposed terms of Equiom's investment.  Jacobs and Robo had planned all along to divert Metro NJ's assets to another company they controlled together, for their own personal gain.

27.     In the course of inducing Equiom to make its $500,000 investment in Metro NJ, Singman, at Jacobs's direction, made at least the following material misstatements of fact during conversations with Scott and in emails to Scott between December 19, 2014 and January 13, 2015.

    a.    "I am getting [Metro NJ's] debt re-financed which will cut debt service by more than half."

    b.    That Vogel and Coughlin controlled Metro NJ.

    c.    That Vogel and Coughlin had the power and ability to merge Metro NJ into a new successor entity, of which Equiom would own 35%.

    d.    That Metro NJ could merge into a new successor entity.

    e.    That others had recently invested $2,500,000 in Metro NJ.

    f.    That Metro NJ's total debt was just over $1,000,000.

    g.    That Equiom's investment would be subordinate only to debt totaling just over $1,000,000.

    h.    That Equiom's investment would be used for "working capital," rather than paying a $50,000 finder's fee to Singman, $18,100 to Jacobs and Robo, and Metro NJ's past due debts.

    i.    That Metro NJ was a stable and profitable business.

    j.    That Metro NJ owned and had rights in substantial assets.

    k.    That Metro NJ would be able to repay any obligations promptly and fully.

    l.    That, in the event that Metro NJ was unable to repay any obligations promptly and fully, Vogel and Coughlin would be willing and able to repay Equiom personally.

28.    Equiom reasonably relied on these misrepresentations.

29.    Upon information and belief, Singman, Jacobs, and Robo all intended for Equiom to rely upon these misrepresentations.

5

30. Singman, at Jacobs's direction, deliberately hid from Equiom the following material facts when Equiom was induced to make its $500,000 investment.

   a. That Metro NJ was effectively insolvent as of January 2015 and was in default on payments to companies called AmRock Capital LLC ("AmRock") and Republic Business Credit LLC, in addition to being delinquent in the payment of at least back taxes, salaries, rent, royalties, and utilities.

   b. That AmRock was threatening to accelerate approximately $1,000,000 of outstanding debt owed by Metro NJ.

   c. That Vogel and Coughlin had each personally guaranteed in excess of $1,000,000 in debt.

   d. That Vogel and Coughlin could not pay the many guarantees they had previously executed, much less the $500,000 they were personally guaranteeing to Equiom.

   e. That Jacobs and Robo effectively controlled Metro NJ.

   f. That Jacobs and Robo would dictate how Equiom's money was used.

   g. That Singman would receive 10% ($50,000) of Equiom's investment.

   h. That agreements executed by Metro NJ prohibited it from merging into a new entity as contemplated by and promised to Equiom.

   i. That Metro NJ was "bleeding" cash due to lower than expected sales and costly working capital credit facilities.

   j. That Metro NJ had been advised to file for protection under the United States Bankruptcy Code in or about January 2015.

31. If Singman, Jacobs, and Robo had disclosed the material facts above, Equiom would not have invested any funds in Metro NJ.

32. Upon information and belief, Singman, Robo, and Jacobs withheld this material information to induce Equiom to invest in Metro NJ.

**JACOBS AND ROBO HAVE THE METRO NJ INVESTMENT DOCUMENTS DRAFTED**

33. Upon information and belief, further demonstrating their control over Metro NJ, Jacobs and Robo directed their attorney, Sean McPherson, Esq. ("McPherson"), to draft documents for the investment in Metro NJ by Equiom. Jacobs and Robo instructed McPherson as to what terms those investment documents should contain.

34. Upon information and belief, Vogel and Coughlin did not direct McPherson on which investment documents to draft and did not give him any input on the documents' terms.

35. The investment documents McPherson drafted included an unsecured convertible note and a note purchase agreement.

36. After the investment documents were in their final form, on the evening of January 12, 2015, Jacobs directed Vogel and Coughlin to sign them that same night or early the next day. Jacobs did not consult Vogel or Coughlin about the investment documents or solicit their input about the contents.

37. On or about January 13, 2015, Vogel signed the unsecured convertible note on behalf of Metro NJ and in favor of Equiom as directed by Jacobs.

38. On or about January 13, 2015, Metro NJ, Vogel, and Coughlin all signed the note purchase agreement.

39. Singman, Jacobs, and Robo collectively presented Vogel and Coughlin as the leaders of Metro NJ to Equiom. In particular, by having Vogel and Coughlin sign the investment documents, Jacobs and Robo concealed that those and other significant company actions were being done at their insistence.

40. Upon information and belief, Vogel and Coughlin had no input on the contents or terms of the investment documents, which contained personal guarantees by them as well as commitments about future action to be taken by them on behalf of Metro NJ.

41. When the investment documents were drafted at their direction, Jacobs and Robo were fully aware that Vogel and Coughlin had already made other personal guarantees well in excess of their combined net worth. Jacobs and Robo likewise knew that they were in control of Metro NJ's actions—not Vogel and Coughlin.

42. Pursuant to the note and the note purchase agreement dated January 13, 2015, Equiom invested $500,000 in Metro NJ in the form of a short term loan on the condition that Metro NJ would "merge with and into a newly formed limited liability company."

43. The entire premise that Equiom could loan $500,000 to Metro NJ and convert that loan into a 35% ownership interest in a new successor entity was false and impossible at the time of lending. Jacobs, Robo, and Singman all knew of this falsity.

44. None of Jacobs, Robo, or Singman ever informed Equiom that the merger contemplated by the investment documents was impossible.

45. Upon information and belief, Jacobs and Robo did not take any steps to merge Metro NJ into a new successor entity and had never intended to do so.

### JACOBS AND ROBO BREACH FIDUCIARY DUTIES THEY OWED TO EQUIOM

46. Unbeknownst to Equiom, during January 2015, Metro NJ was generally not paying its debts as they became due. At least by the time Equiom made its $500,000 investment, Metro NJ was effectively insolvent.

47. Jacobs and Robo controlled Metro NJ through its board of managers when Equiom made the $500,000 investment.

48. Jacobs and Robo owed Equiom fiduciary duties at least from the moment Equiom made its investment into Metro NJ.

49. As soon as Equiom made its $500,000 investment into Metro NJ, it was Jacobs and Robo who directed how the funds would be used and how Metro NJ would proceed.

### FIRST, JACOBS PURCHASES THE RIGHTS TO METRO NJ'S DEBTS

50. About the time that Equiom made its investment in Metro NJ, Jacobs and Robo began negotiating with AmRock—ostensibly on behalf of Metro NJ and for the benefit of its creditors, including Equiom.

51. On or about January 23, 2015, AmRock and Metro NJ executed a Forbearance Agreement.

52. The Forbearance Agreement was not a restructuring of Metro NJ's debt.

53. The Forbearance Agreement did not reduce the cost of Metro NJ's debt.

54. Jacobs personally secured the right to purchase Metro NJ's debt to AmRock for 90% of its value.

55. Jacobs paid nothing for obtaining this right.

56. Jacobs did not offer Equiom or, upon information and belief, any other investors in Metro NJ, the right to buy Metro NJ's AmRock debt at a discount or otherwise.

57. No one other than Jacobs received the right to purchase Metro NJ's debt to AmRock for 90% of its value.

9

**SECOND, JACOBS AND ROBO RAID METRO NJ'S ASSETS**

58. Equiom made its investment of $500,000 into Metro NJ on January 13, 2015.

59. Upon information and belief, on or about January 12, 2015, Jacobs had registered Metro DE as a Delaware limited liability company through McPherson.

60. Upon information and belief, in or about April 2015, Metro DE took over all of Metro NJ's assets—including its licenses, customer relationships, and contracts—for less than fair consideration.

61. As of June 2015, the sole member of Metro DE was Robo, and the sole member of Robo was Jacobs.

62. Jacobs and Robo led all of these actions to take over Metro NJ's assets without informing Equiom.

63. Singman was also involved in the conversion of assets and other things of value to Metro DE from Metro NJ.

64. None of Singman, Jacobs, or Robo informed Equiom that assets were being transferred to Metro DE from Metro NJ.

65. After Metro DE had effectively assumed all of Metro NJ's valuable assets, Jacobs had Metro DE's name changed to LHP.

66. Singman worked with Jacobs and was associated with LHP at least through December 2015.

67. Today, LHP conducts the same business that Metro NJ once did—utilizing the same licenses and selling the same products to the same customers. LHP and Robo operate from the same address.

68. Upon information and belief, LHP paid Metro NJ nothing for Metro NJ's licenses, customer relationships, or contractual relationships.

69. Nothing was paid to Equiom when LHP took control of Metro NJ's licenses, customer relationships, and contractual relationships.

70. Upon information and belief, Metro NJ no longer operates but has not formally dissolved or filed for bankruptcy.

71. None of the principal on the $500,000 loan to Metro NJ has been repaid to Equiom. Since March 1, 2015, none of the Default interest accruing on the principal at the annual rate of 12% has been paid to Equiom.

72. Jacobs and Robo took no steps to repay any of these amounts due to Equiom.

73. Jacobs and Robo took no steps to permit Equiom to convert its note into equity in Metro NJ, Metro DE, or LHP.

74. Equiom never converted any portion of its note into equity in Metro NJ, Metro DE, or LHP.

75. Vogel filed for bankruptcy on or about July 15, 2015.

76. Coughlin filed for bankruptcy on or about August 21, 2015.

77. To the extent they ever were, Vogel and Coughlin are not now associated with LHP in any way.

78. Upon information and belief, Jacobs still owns and runs LHP, and LHP continues to use the assets it misappropriated from Metro NJ to conduct business.

79. Because of the misconduct by Jacobs, Singman, Robo, and LHP, Equiom has sustained damages including, but not limited to, the $500,000 investment amount, interest, and the costs and fees of attempting to recover the investment.

## COUNT ONE
### (FRAUD)

80. Plaintiff Equiom repeats and re-alleges the allegations contained in paragraphs 1 to 79 as if fully stated herein.

81. From December 19, 2014 to January 13, 2015, Singman under Jacobs and Robo's direction made numerous misrepresentations of present or past facts in inducing Equiom to invest $500,000 in Metro NJ. Among them were misrepresentations about who controlled Metro NJ, how Metro NJ could be restructured, and how Metro NJ was capable of repaying its debts.

82. Upon information and belief as demonstrated by contemporary correspondence, Singman knew that these misrepresentations of fact were material to Equiom's decision whether to invest in Metro NJ.

83. Upon information and belief as demonstrated by contemporary correspondence, Singman knew that the material misrepresentations of fact were false when they were made.

84. Singman intended for Equiom to rely on the material misrepresentations of facts in deciding to invest in Metro NJ.

85. Equiom reasonably relied upon the material misrepresentations of facts to its detriment by making the $500,000 investment in Metro NJ.

86. As a result, Equiom has suffered damages in an amount to be determined at trial.

87. Equiom is also entitled to an award of punitive damages in an amount not less than $500,000 with interest thereon, as a result of Singman's willful and contumacious behavior.

## COUNT TWO
### (BREACH OF FIDUCIARY DUTY)

88. Plaintiff Equiom repeats and re-alleges the allegations contained in paragraphs 1 to 79, and 81 to 87 as if fully stated herein.

89. Metro NJ was controlled by its board of managers.

90. By at least September 22, 2014, Jacobs and Robo controlled the Metro NJ board of managers.

91. During January 2015, Equiom invested $500,000 in Metro NJ.

92. Unbeknownst to Equiom, at the time of its investment, Metro NJ was effectively insolvent.

93. When Equiom made the investment, it became a creditor of Metro NJ.

94. At least as soon as Equiom made its investment, Jacobs and Robo owed Equiom fiduciary duties of loyalty, care, and good faith.

95. Jacobs and Robo breached these fiduciary duties by taking over Metro NJ's valuable assets to enrich themselves at the expense of Metro NJ's creditor, Equiom.

96. Specifically, Metro NJ's assets were transferred for less than fair consideration to the company currently known as LHP—which Jacobs and Robo controlled.

97. As a result, Equiom has suffered damages in an amount to be determined at trial.

## COUNT THREE
## (AIDING AND ABETTING FRAUD)

98. Plaintiff Equiom repeats and re-alleges the allegations contained in paragraphs 1 to 79, 81 to 87, and 89 to 97 as if fully stated herein.

99. From December 19, 2014 to January 13, 2015, Singman under Jacobs and Robo's direction made numerous misrepresentations of present or past facts in inducing Equiom to invest $500,000 in Metro NJ. Among them were misrepresentations about who controlled Metro NJ, how Metro NJ could be restructured, and how Metro NJ was capable of repaying its debts.

100. Upon information and belief, Jacobs and Robo knew that these misrepresentations of fact were material to Equiom's decision whether to invest in Metro NJ.

101. Upon information and belief, Jacobs and Robo knew that the material misrepresentations of fact were false when they were made.

13

102. Jacobs and Robo intended for Equiom to rely on the material misrepresentations of facts in deciding to invest in Metro NJ.

103. Equiom reasonably relied upon the material misrepresentations of facts to its detriment by making the $500,000 investment in Metro NJ.

104. Jacobs and Robo instigated Singman's fraud—hiring him and directing him to make material misrepresentations of fact to Equiom.

105. Jacobs and Robo encouraged Singman's fraud—offering him a 10% finder's fee and having investment documents created to facilitate a false deal with Equiom.

106. Jacobs and Robo knowingly and substantially assisted Singman's fraud against Equiom by, among other actions, having their attorney MacPherson draft the investment documents and by directing Vogel and Coughlin to sign the investment documents.

107. As a result, Equiom has suffered damages in an amount to be determined at trial.

108. Equiom is also entitled to an award of punitive damages in an amount not less than $500,000 with interest thereon, as a result of Jacob and Robo's willful and contumacious behavior.

## COUNT FOUR
### (CONSTRUCTIVE TRUST)

109. Plaintiff Equiom repeats and re-alleges the allegations contained in paragraphs 1 to 79, 81 to 87, 89 to 97, and 99 to 108 as if fully stated herein.

110. The company currently known as LHP willfully took over Metro NJ's assets for less than fair consideration in furtherance of Jacobs and Robo's plan to enrich themselves at the expense of Metro NJ's creditor, Equiom.

111. LHP was acting in concert with Jacobs and Robo—who controlled LHP.

112. LHP's acts in the course of misappropriating Metro NJ's valuable assets were wrongful.

113. LHP was unjustly enriched when it took over Metro's NJ's assets.

114. As a result, a constructive trust should be imposed on Metro NJ's assets that were transferred to LHP.

## COUNT FIVE
## (UNJUST ENRICHMENT)

115. Plaintiff Equiom repeats and re-alleges the allegations contained in paragraphs 1 to 79, 81 to 87, 89 to 97, 99 to 108, and 110 to 114 as if fully stated herein.

116. Through its investment of $500,000 into Metro NJ, Equiom conferred funds that should have been utilized by the company as working capital. Instead, at the direction of Jacobs and Robo, Equiom's investment was wrongfully diverted for the individual benefit of at least Singman, Jacobs, and Robo.

117. At minimum, Singman individually benefitted by being paid a 10% finder's fee of $50,000 from Equiom's investment.

118. At minimum, Jacobs and Robo individually benefitted by being paid $18,100 from Equiom's investment.

119. Allowing Singman, Jacobs, or Robo to retain any financial benefits from Equiom's investment would be unjust.

120. As a result, Equiom has suffered damages of at least $68,100, with the final amount to be determined at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff Equiom respectfully requests that this Court grant the following relief:

(A) A monetary judgment against Singman, Jacobs, and Robo in an amount to be determined at trial of not less than $500,000, together with appropriate interest;

(B) Punitive damages against Singman, Jacobs, and Robo in an amount to be determined at trial of not less than $500,000, together with appropriate interest, for their fraudulent and contumacious conduct;

(C) An order imposing a constructive trust on the Metro NJ assets that were transferred to LHP in an amount to be determined at trial of not less than $500,000;

(D) An order awarding Equiom its attorneys' fees, costs, and expenses; and

(E) An order awarding Equiom such other relief as the Court deems just and proper.

Dated: July 18, 2016
New York, New York

        MOREA SCHWARTZ BRADHAM
        FRIEDMAN & BROWN LLP

By:   /s/ Thomas A. Brown II
       Thomas A. Brown II (TB1642)
       444 Madison Avenue, 4th Floor
       New York, New York 10022
       Phone: (212) 695-8050

*Attorneys for Plaintiff Equiom (Isle of Man) Limited (as Trustee of the Lausar Settlement Trust)*

## VERIFICATION

I make this verification on behalf of Plaintiff Equiom (Isle of Man) Limited (as Trustee of the Lausar Settlement Trust). I have reviewed the foregoing Complaint, and hereby declare under penalty of perjury under the laws of the United States of America that the same is true and correct to my knowledge, information, and belief.

Executed on July 18, 2016.

By: _____
Name: BARRY CURTIS SMITH
Title: DIRECTOR

## LOCAL CIVIL RULE 11.2 CERTIFICATION

Pursuant to Local Civil Rule 11.2, I hereby certify under penalty of perjury that the matter in controversy is also the subject of the following actions pending:

- Equiom (Isle of Man) Ltd. (as Trustee of the Lausar Settlement) v. Warren S. Vogel, Adversary Proceeding No. 15-02305 (KCF) (Bankr. D.N.J.)

- Equiom (Isle of Man) Ltd. (as Trustee of the Lausar Settlement) v. Michael Coughlin, Adversary Proceeding No. 15-02445 (KCF) (Bankr. D.N.J.)

- Republic Business Credit, LLC vs. Metro Design USA, LLC, Case No. N15C-09-233 (DE Sup. Ct.)

Dated: July 18, 2016
New York, New York

                                      MOREA SCHWARTZ BRADHAM
                                      FRIEDMAN & BROWN LLP

By:    /s/ Thomas A. Brown II
           Thomas A. Brown II (TB1642)
           444 Madison Avenue, 4th Floor
           New York, New York 10022
           Phone: (212) 695-8050

           *Attorneys for Plaintiff Equiom (Isle of Man)*
           *Limited (as Trustee of the Lausar Settlement Trust)*