NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| EQUIOM (ISLE OF MAN) LIMITED (as Trustee of the Lausar Settlement Trust),<br><br>Plaintiff,<br><br>v.<br><br>ROBERT JACOBS, COREY SINGMAN, ROBO ASSOCIATES LLC, and LLOYD HARBOR PARTNERS LLC,<br><br>Defendants. | Civil Action No.: 16-04362<br><br><br>**OPINION** |

**CECCHI, District Judge.**

This matter comes before the Court on the motions for partial summary judgment (ECF Nos. 53-54) of Defendants Robert Jacobs ("Jacobs") and Robo Associates LLC ("Robo") (collectively, "Defendants").[1]  The motions seek judgment on Counts Two and Three of the Complaint (ECF No. 1) ("Compl."), filed by Equiom (Isle of Man) Limited ("Plaintiff").  The Court has considered the submissions made in support of and in opposition to the instant motions.  *See* ECF Nos. 53-1, 54-1, 55, 59-1, 60-1.  The motions are decided without oral argument pursuant to Federal Rule of Civil Procedure 78.[2]  For the reasons set forth below, Defendants' motions for partial summary judgment are **DENIED**.

---

[1] The two motions present identical arguments.

[2] The Court considers any new arguments not presented by the parties to be waived. *See Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am.*, 927 F.2d 1283, 1298 (3d Cir. 1991) ("It is well established that failure to raise an issue in the district court constitutes a waiver of the argument.").

## I.      BACKGROUND

This case arises out of an investment by Plaintiff in Metro Design USA, LLC ("Metro NJ") as a result of multiple alleged misrepresentations made to Plaintiff by Defendants.  ECF No. 53-4 ¶¶ 10, 23-24 ("Def. SMF").[3]

Metro NJ was founded in 2007 by non-parties Warren Vogel ("Vogel") and Michael Coughlin ("Coughlin") and was engaged in the business of marketing and selling various consumer products to "big-box retailers."  Id. ¶¶ 1-2.  As of late 2013, Metro NJ struggled to turn a profit and "needed outside assistance if it was going to survive as a going concern."  Id. ¶ 3.  Around this time, Defendants contend that they were hired by Metro NJ to provide "management consulting services."  Id. ¶¶ 4-5.  Defendant Jacobs formed Robo to provide "management consulting services to struggling businesses."  Id. ¶ 4.  Around late 2013, Jacobs was introduced to Vogel to try to help turn around Metro NJ's operations, and by late March 2014, Robo was formally engaged by Metro NJ to provide consulting services.  Id. ¶¶ 4-5.

The parties dispute Defendants' degree of involvement in Metro NJ.  Id. ¶ 5; ECF No. 58 at 2-3 ("Pl. Resp.").  According to Plaintiff, Defendants were not mere consultants, but rather "had control over Metro [NJ]."  Pl. Resp. at 2-3.  Plaintiff maintains that this control was total as of December 2014; Vogel and Coughlin received all their directions from Jacobs, Jacobs was in full control of Metro NJ's cash management and the board, and Jacobs even dictated the employment terms and salaries of all Metro NJ employees, including Vogel and Coughlin.  Id. at 3, 7.  Accordingly, whether Defendants were directors or officers of Metro NJ is in dispute.  Def. SMF ¶ 27; Pl. Resp. at 13-14; ECF No. 59-1 at 17-18 ("Def. Reply").  Plaintiff argues that Jacobs appointed himself to the board of managers, labeled himself as managing director, listed himself as a board member on both internal emails and

---

[3] Unless otherwise indicated, the following facts are not in dispute and are drawn from the parties' Local Rule 56.1 statements.  The Court notes that if a fact is in dispute, it will be represented by citations to both parties' Local Rule 56.1 statements.

those with third parties, and maintained that he had sole discretion to appoint a third member of a five-person board.  Pl. Resp. at 13-14.  Defendants contend that they were never appointed board members, and that Metro NJ's operating agreement was never amended to name them as board members.  Def. Reply at 17.

It is disputed whether Jacobs purposely forwarded to Defendant Corey Singman ("Singman")—an investment banker who had many investor contacts—inflated projections and other false information knowing that Singman would forward the information directly to Plaintiff to induce its investment.[4]  Def. SMF ¶ 10; Pl. Resp. at 6-7; Def. Reply at 8, 28.  It is undisputed that toward the latter part of 2014, Jacobs introduced Vogel to Singman.  Def. SMF ¶ 8.  However, Defendants aver that it was at Vogel's direction that Singman specifically pursue Plaintiff as an investor.  Id.  Plaintiff contends that it was Jacobs, not Vogel, who instructed Singman to pursue Plaintiff as an investor.  Pl. Resp. at 5.  Nevertheless, acting at the behest of Metro NJ, Singman duly contacted Plaintiff in December 2014 through Plaintiff's agent, Phillip Scott ("Scott"), asking for and securing Plaintiff's investment.  Def. SMF ¶¶ 9-10.  Plaintiff contends that throughout the course of the negotiation between Scott and Singman, Jacobs was in constant contact with Singman regarding Plaintiff's potential investment.  Id.  These contacts included Jacobs sending Singman a "pitch deck" of slides with false information about Metro NJ, the company's past financials, and a set of inflated projections for 2015 that Jacobs personally created ("Jacobs Projections").  Pl. Resp. at 14-17.  Plaintiff contends that this false information provided to it by Singman—who received it from Jacobs—is what induced its investment in Metro NJ.  Def. SMF ¶¶ 23-24.  It is disputed whether Jacobs knew Singman was going to forward these emails directly to Scott.  Id. ¶ 10; Pl. Resp. at 6-7; Def. Reply at 8, 28.  Nonetheless, some of the emails from Jacobs to Singman were directly forwarded to Scott.  Pl. Resp. at 6-7, Def. Reply at 8.

---

[4] A default has since been entered against Singman.  *See* ECF No. 24 at 2; *see also* ECF No. 8.

Plaintiff contends there were multiple misrepresentations (and omissions) of material information that induced Plaintiff's investment in Metro NJ.  Pl. Resp. at 14-23.  One of the alleged misrepresentations made by Singman to Scott was that Plaintiff's investment would be used to strategically restructure Metro NJ's business.  Def. SMF ¶ 11.  The investment was also conditioned on Metro NJ "merg[ing] with and into a newly formed limited liability company" shortly after the transaction was completed.  Id. ¶ 18.  Defendants concede that "Equiom relied on the misrepresentations of Singman" (id. ¶ 12), but maintain that they were not made by Singman with the intent to mislead, Id. ¶¶ 28-29.  Plaintiff argues that both Singman and Jacobs were aware that they were conveying false information to Scott, and that they also intentionally withheld material information to mislead Scott, all to induce Plaintiff's investment.  Pl. Resp. at 18-27.

Plaintiff agreed to invest $500,000 in Metro NJ, and the note purchase agreement was signed by Metro NJ, Vogel, and Coughlin.  Def. SMF ¶¶ 16-17, 24.  Plaintiff maintains that Vogel and Coughlin signed at Jacobs' direction, and that they played no role in any negotiations.  Pl. Resp. at 8-9.  On January 12, 2015—a day before the loan was to be made—Metro NJ's attorney registered Metro Design USA LLC ("Metro DE") as a Delaware limited liability company, pursuant to the condition of the investment.  Def. SMF ¶ 19.  However, Defendants contend that "[u]nbeknownst to both Plaintiff and Defendants, Vogel had apparently pledged 100% of Metro [NJ's] equity to Sean Moore ("Moore")."  Id. ¶ 20.  Plaintiff does not dispute that Vogel did this but contends that Jacobs knew that the equity was pledged to Moore while the negotiations with Scott and Singman were ongoing, and therefore was aware that the merger condition agreed to was not possible to satisfy.[5]  Pl. Resp. at 10.

---

[5] Plaintiff avers that other impediments also existed that prevented the merger.  These included a forbearance agreement with AmRock (a creditor of Metro NJ), Metro NJ's insolvency, and the fact that Metro NJ was considering seeking protection under the federal bankruptcy laws as of January 2015.  Pl. Resp. at 11.  Defendants contend that the equity pledge to Moore was the only real impediment, and that "any other impediments could have been adequately addressed."  Def. Reply at 14.

Finally, Plaintiff claims that "[n]one of the principal on the $500,000 loan to Metro NJ has been repaid," that "none of the Default interest accruing on the principal at the annual rate of 12% has been paid," and that Plaintiff never received any equity in any successor entity.  Compl. ¶¶ 71-74.

## II.   PROCEDURAL HISTORY

In its Complaint, Plaintiff asserted the following claims against these Defendants: breach of fiduciary duty (Count Two), aiding and abetting fraud (Count Three), and unjust enrichment (Count Five).  *See* Compl. ¶¶ 80-120.  On May 4, 2017, Defendants moved to dismiss Counts Two and Five of the Complaint.[6]  *See* ECF Nos. 21-1, 22-1 at 1.  By order and opinion dated December 22, 2017, the Court denied Defendants' motions to dismiss in their entirety.  *See* ECF No. 39.  Defendants now move for partial summary judgment on Counts Two and Three of the Complaint.[7]  *See* ECF Nos. 53-1, 54-1.

## III.   LEGAL STANDARD

Summary judgment is appropriate if the "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials" demonstrate that there is no genuine issue as to any material fact, and, construing all facts and inferences in a light most favorable to the non-moving party, "the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986); *see also Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986); Fed. R. Civ. P. 56(c).

The moving party has the initial burden of proving the absence of a genuine issue of material fact.  *See Celotex*, 477 U.S. at 323.  Once the moving party meets this burden, the non-moving party

---

[6] Defendants also initially moved to dismiss Count One of the Complaint.  However, Plaintiff clarified that Count One of the Complaint is not directed at either Jacobs or Robo.  ECF No. 24 at 1.  Defendants subsequently dropped any claims with regards to Count One of the Complaint.  *See* ECF Nos. 25-1, 26-1 at 1.

[7] Defendants' motions for partial summary judgment were administratively terminated after this Court ordered the parties to mediation on July 24, 2019.  *See* ECF No. 61.  After mediation proved unsuccessful, the motions were reinstated on November 25, 2020.

has the burden of identifying specific facts to show that, to the contrary, a genuine issue of material fact exists for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  In order to meet its burden, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324; *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990) (stating that "[t]he object of [Rule 56(e)] is not to replace conclusory allegations of the complaint . . . with conclusory allegations of an affidavit"); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992) ("To raise a genuine issue of material fact . . . [the opponent must] exceed[] the 'mere scintilla' threshold.").

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. *Anderson*, 477 U.S. at 248.  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. *Id.*  In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

IV.   <u>**DISCUSSION**</u>

A.  **Count Two (Breach of Fiduciary Duty)**

Defendants contend that they are entitled to summary judgment on the breach of fiduciary duty claim for two reasons: (1) Plaintiff lacks standing to bring this claim because it can only be asserted derivatively (and Plaintiff has brought it as a direct claim); and (2) even if Plaintiff had asserted the claim derivatively, Defendants were not directors or officers of Metro NJ, and as such, did not owe Plaintiff a fiduciary duty.  ECF Nos. 53-1, 54-1 at 12-16.  Plaintiff asserts that under New Jersey law, it is permissible for creditors to bring direct claims against directors of a company for breach of fiduciary

duty once the company becomes insolvent (as Plaintiff argues it was here).  ECF No. 55 at 22.  Plaintiff

also argues that the evidence shows that Jacobs had taken full control of Metro NJ, and as a controlling

board member of an insolvent company, Jacobs owed Plaintiff fiduciary duties.  Id. at 20.

     i.   <u>Plaintiff has Standing to Assert a Breach of Fiduciary Duty Claim</u>

"A claim for breach of fiduciary duty . . . requires that a plaintiff show (1) the existence of a

fiduciary duty, (2) the breach of that duty by the defendant, and (3) resulting damages."  *Miller v.

Butler*, 2014 WL 1716184, at *3 (D.N.J. Apr. 30, 2014).  Generally, "directors owe no [fiduciary] duty

to corporate creditors."  *VFB L.L.C. v. Campbell Soup Co.*, 482 F.3d 624, 635-36 (3d Cir. 2007).

However, under New Jersey law, "[o]nce a corporation becomes insolvent . . . the directors assume a

fiduciary or 'quasi-trust' duty to the corporation's creditors" where the directors cannot prefer one

creditor over another.  *Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d

164, 173 (3d Cir. 2002) (citing *AYR Composition, Inc. v. Rosenberg*, 261 N.J. Super. 495, 505 (App.

Div. 1993)).  This claim can be asserted directly.  *See e.g.*, *Foodtown*, 296 F.3d at 173 (finding that a

board of trustees of a pension fund [creditor] had standing to directly pursue breach of fiduciary duty

claims against a corporation's officers and directors).

Plaintiff has produced sufficient evidence to establish, or at the very least raise a genuine issue

of material fact, that Metro NJ was insolvent as of January 2015 (the same month Plaintiff made its

investment).  *See* ECF No. 56, Scott Aff. ¶ 14(a); ECF No. 56, Ex. 9; ECF No. 56, Ex. 16; ECF No.

57-3, Ex. 47; ECF No. 57-5, Ex. 79, Vogel Dep. Tr. at 8:20-23; ECF No. 57-5, Ex. 80, Coughlin Dep.

Tr. at 9:21-10:8.  There is also evidence of Jacobs favoring other creditors over Plaintiff.  ECF No. 56,

Scott Aff. ¶ 14(q); ECF No. 57-4, Exs. 69-70.  Accordingly, as a creditor of an insolvent company,

Plaintiff has standing to bring a direct claim for breach of fiduciary duty under the laws of New Jersey.

*See e.g.*, *Foodtown*, 296 F.3d at 173.  The only remaining inquiry is whether Defendants were directors

and/or officers, thereby permitting Plaintiff to assert the breach of fiduciary duty claim specifically

against them.

Defendants arguments to the contrary are unavailing.  Defendants argue that because New Jersey caselaw "is clearly very limited" with regards to situations in which creditors may bring claims for breach of fiduciary duties, this Court should defer to Delaware law.  ECF Nos. 59-1, 60-1 at 7 (citing *Canter v. Lakewood of Voorhees*, 420 N.J. Super. 508, 517 (App. Div. 2011) (holding that absent authority in New Jersey, New Jersey courts consult Delaware corporate law for guidance)).  Under Delaware law, a breach of fiduciary duty claim brought by a creditor of an insolvent corporation must be brought derivatively, not directly.  *Quadrant Structured Prods. Co. v. Vertin*, 102 A.3d 155, 166 (Del. Ch. 2014) (citing *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 103 (Del. 2007)).  However, given the legal authority cited above, New Jersey law is not "absent authority" on this topic as Defendants suggest.[8]  *See* ECF Nos. 53-1, 54-1 at 13 n.2.  New Jersey law appropriately applies here as to all of Metro NJ's corporate governance issues.  Metro NJ was organized under the laws of New Jersey, ECF Nos. 53-1, 54-1 at 7, maintains its principal place of business in New Jersey, ECF No. 56, Scott Aff. ¶ 3, and thus, has no connection with Delaware.

Defendants further attempt to distinguish New Jersey caselaw by arguing that "those creditors [in the New Jersey cases] were not analogous to Plaintiff's position as an investor, which is a special type of creditor," is also without merit.  ECF Nos. 59-1, 60-1 at 7.  Defendants characterize the transaction with Plaintiff as "a convertible *loan* of $500,000."  Def. SMF ¶ 10 (emphasis added).  Additionally, the authority Defendants point to makes no explicit distinction between creditors and "investors," the latter of which Defendants contend "is a special type of creditor."  *See* ECF Nos. 59-1, 60-1 at 7; *see also Foodtown*, 296 F.3d at 173 (using the phrase "corporation's creditors," making no meaningful distinction among creditors).

---

[8] The Court notes that it also applied New Jersey law in its previous opinion when discussing Plaintiff's breach of fiduciary duty claim.  *See* ECF No. 39 at 5-7.

ii.    Defendants were Directors and/or Officers

Defendants contend that no fiduciary duty was breached here because no fiduciary relationship ever existed.  ECF Nos. 53-1, 54-1 at 16.  Defendants argue that they were not officers or directors but merely consultants hired by Metro NJ to help with the company's finances.  *See* id.  In fact, they assert that the operating agreement did not mention Defendants in any capacity.  Id.  Thus, Defendants argue, summary judgment should be entered in their favor on this claim.  Id.  Plaintiff contends that since Defendants exerted full control over Metro NJ's finances, held themselves out to third parties as members of the board, controlled the board, spoke for the board, and even seemingly appointed themselves to the board, they owed fiduciary duties to all of Metro NJ's creditors.  ECF No. 55 at 21-22.  The Court finds that there is a genuine issue of material fact here.  *See Celotex*, 477 U.S. at 323.

As to the evidence presented, Defendants point to Metro NJ's operating agreement which lacks any mention of Defendants, and does not include any amendment indicating any changes to include Defendants as members of the board.  *See* ECF No. 53-3, Ex. A.  By contrast, Plaintiff presented a plethora of evidence to, at the very least, rebut the notion that there is no genuine dispute.  Per the documents, Jacobs held himself out to be Executive Chairman of the Board of Managers.  *See* ECF No. 57-2, Ex. 40.  In an October 2014 email to Singman—which included a "pitch deck" to induce potential investors of Metro NJ—on a slide titled "Board Members," Jacobs listed himself.  *See* ECF No. 57-1, Ex. 21.  In a prior email to Vogel in June of 2014, Jacobs stated that "Augie Deluca and Bob Jacobs will join the Metro Board," and that "Bob Jacobs/Robo, at *his sole discretion* can appoint a 3rd member."  ECF No. 57-2, Ex. 41 (emphasis added).  These representations were also made to third parties outside of Metro NJ.  In a February 2015 email, Jacobs emailed Tammy Telerico—the owner of a license Metro NJ used—again referring to himself as a board member.  *See* ECF No. 57-3, Ex. 42.  The record also indicates instances of Jacobs speaking for the board.  *See* ECF No. 56, Scott Aff. ¶ 9; ECF No. 56, Ex. 3 ("[S]ee attached to help understand the Board's confidence in management's 2015 revenue projections. . . . I am (and the Board) very confident 2015 will be a breakout year for Metro if

funded appropriately.").

In addition to these representations made by Jacobs, it appears that there also is a material dispute regarding the degree of control Jacobs exercised over Metro NJ.  Plaintiff produced evidence demonstrating that Jacobs eventually exerted sole control over Metro NJ's finances, thereby displacing any role that Vogel or Coughlin held.  *See* ECF No. 57-5, Ex. 77, Jacobs Dep. Tr. at 19:4-7, 203:15-18; ECF No. 57-5, Ex. 78, Singman Dep. Tr. at 72:23-74:9; ECF No. 57-5, Ex. 80, Coughlin Dep. Tr. at 74:8-75:20.  The evidence suggests that Jacobs was able to dictate how Plaintiff's entire investment would be spent.  *See* ECF No. 56, Scott Aff. ¶ 14(p); ECF No. 57-2, Exs. 33-38; ECF No. 57-5, Ex. 77, Jacobs Dep. Tr. at 19:4-7, 252:18-253:17, 277:9-18.  Jacobs also apparently had total "approval authority" over Vogel and Coughlin's employment terms and salaries.  *See* ECF No. 57-1, Exs. 19-20; ECF No. 57-5, Ex. 79, Vogel Dep. Tr. at 45:9-47:25; ECF No. 57-5, Ex. 80, Coughlin Dep. Tr. at 77:13-80:8.  The sole fact that the operating agreement was never amended to adequately reflect Defendants position in the company is not fatal to Plaintiff's claim.  On a motion for summary judgment, the Court is not to weigh the evidence nor make credibility judgments; rather, the non-moving party's evidence is to be believed and all inferences are to be made in their favor.  *Marino*, 358 F.3d at 247 (citing *Anderson*, 477 U.S. at 255).  Thus, at the very least, the above evidence produced by Plaintiff creates a genuine issue of material fact as to whether Defendants were in fact directors or officers.  *See Celotex*, 477 U.S. at 330.  Therefore, the motions are denied as to Count Two.

**B.  Count Three (Aiding and Abetting Fraud)**

Defendants next argue that summary judgment is proper as to Count Three because "Plaintiff cannot show that a fraud was committed [by Singman]," and as such, the aiding and abetting fraud claim against Defendants must fail.[9]  ECF Nos. 53-1, 54-1 at 17.  Defendants further contend that even

---

[9] There is no fraud claim against Defendants.  *See* ECF Nos. 53-1, 54-1 at 17.  The fraud claim is only against Singman.  Id.

if the fraud claim against Singman could be established, there is no evidence that Defendants aided and abetted said fraud.  Id. at 18.  Plaintiff asserts that the evidence establishes that Jacobs and Singman not only knew that the information Singman provided to Scott was false, but in fact, it was Jacobs who "orchestrated and directed everything Singman did and did not tell [Plaintiff]."  ECF No. 55 at 24-27.  Plaintiff concludes that this evidence demonstrates that Defendants did aid and abet Singman in his fraud, or at a minimum, it creates a genuine dispute as to whether they did.  Id. at 27.

      i.   <u>Common Law Fraud</u>

Defendants contend that there is "no evidence that Singman committed a fraud or conveyed anything to Plaintiff he knew to be false."  ECF Nos. 53-1, 54-1 at 18.  Plaintiff claims that the evidence demonstrates that both Singman and Jacobs knew the information provided to Scott was false.  ECF No. 55 at 25.  The Court finds that a genuine issue of material fact exists as to this issue.  *See Celotex*, 477 U.S. at 323.

Establishing fraud is a prerequisite to proving a claim of aiding and abetting fraud.  *See State Dep't of Treasury, Div. of Inv. ex. rel. McCormac v. Qwest Commc'ns Int'l, Inc.*, 387 N.J. Super. 469, 485 (App. Div. 2006).  Under New Jersey law, "[t]he elements of common-law fraud are (1) a material misrepresentation of a presently existing or past fact; (2) *knowledge or belief* by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages."  *Allstate N.J. Ins. Co. v. Lajara*, 222 N.J. 129, 147 (2015) (emphasis added) (internal citations omitted).  Defendants appear to contend that the "knowledge" element of the fraud claim is absent here.  *See* ECF Nos. 53-1, 54-1 at 18.

Defendants direct the Court to Singman's deposition testimony to establish that Singman did not convey anything to Plaintiff that he *knew* to be false.  Id.  At his deposition, Singman was directly asked whether he believed that the representations he made to Scott were untrue, to which he responded, "No."  *See* ECF No. 53-3, Ex. B, Singman Dep. Tr. at 159:6-18.  When asked if he was "trying to deceive [Scott]," he again responded, "No."  Id. 154:13-14.  However, Singman's two lines

11

of testimony, taken alone, are insufficient to satisfy Defendants' burden of establishing the absence of a genuine dispute as to whether Singman *knew* he was conveying untrue information. *See Irwin Katz & Assocs., Inc. v. Concepts in Health, Inc.*, 2015 WL 4251156, at *3 (D.N.J. July 13, 2015) (stating that a defendant's self-serving testimony alone was not sufficient to meet her burden of showing that no genuine dispute of material fact existed) (internal citations omitted).

Moreover, Plaintiff has provided ample evidence to the contrary; the most compelling of which is a December 9, 2014 email sent by Vogel to certain Metro NJ employees after a board meeting— including *both* Jacobs and Singman—that contained sales projections for 2015 ("Vogel Projections"). *See* ECF No. 56, Scott Aff. ¶ 8; *see also* ECF No. 56, Ex. 2. According to the Vogel Projections, Metro NJ was projected to do about $3,000,000 in sales, having the potential to grow to $5,700,000. ECF No. 56, Ex. 2. However, when Singman emailed Scott to discuss Plaintiff's potential investment in Metro NJ on December 19, 2014, Singman sent him a document created by Jacobs—the Jacobs Projections—that projected that Metro NJ would have a revenue of $8,295,258; a much higher amount compared to the modest Vogel Projections that were circulated internally. *See* ECF No. 56, Scott Aff. ¶ 9; *see also* ECF No. 56, Ex. 1. Scott was never sent the Vogel Projections. *See* ECF No. 56, Scott Aff. ¶ 14(c). A few weeks later, when Scott questioned Singman regarding the Jacobs Projections, Singman forwarded him an email from Jacobs which characterized the Jacobs Projections as "conservative." *See* ECF No. 56, Scott Aff. ¶ 9; *see also* ECF No. 56, Exs. 3, 5. Between December 9 and December 19, there is no evidence suggesting that the company's finances improved to warrant the drastic increase seen between the Vogel Projections and the Jacobs Projections. *See e.g.*, ECF No. 57-3, Ex. 44 (showing Metro NJ was a month and a half late on rent as of December 18, 2014). Additionally, Plaintiff presented evidence that demonstrates that Jacobs and Singman both knew that Metro NJ's 2014 projections were missed by almost $2,000,000. ECF No. 56, Scott Aff. ¶ 14(b); ECF No. 57, Exs. 43, 48-51 (emails containing 2014 projections). Thus, it is not clear what the increase was predicated on (if anything).

Under New Jersey law, an action for common law fraud "must be predicated on a statement of *present or past fact*. Predictions of future events are not actionable." *Pai v. DRX Urgent Care, L.L.C.*, 2014 WL 837158, at *12 (D.N.J. Mar. 4, 2014) (emphasis added) (internal citations omitted); *see also Chatlos Sys., Inc. v. Nat'l Cash Register Corp.*, 479 F. Supp. 738, 748-49 (D.N.J. 1979), *aff'd in part*, *rev'd in part*, 635 F.2d 1081 (3d Cir. 1980) ("Statements as to future or contingent events, as to expectations and probabilities, or as to what will be or is intended to be done in the future, do not constitute misrepresentations even though they turn out to be false, at least where they are not made *with intent to deceive*, and where the parties have *equal means of knowledge* . . . .") (emphasis added) (internal citations omitted).  Contrary to Defendants' assertion, the fraud claimed here is not based solely on the future projections.  *See* ECF Nos. 59-1, 60-1 at 8.  Viewing the evidence in the light most favorable to Plaintiff, as the Court must at this stage, there are triable issues of fact as to whether Defendants should have been aware that the Jacobs Projections were not "conservative" in light of the fact that Metro NJ missed its 2014 projections by nearly $2,000,000.  ECF No. 56, Scott Aff. ¶ 14(b); ECF No. 57, Exs. 43, 48-51 (emails containing 2014 projections).  The record indicates that Defendants chose to send their allegedly inflated projections—not the more modest ones that were circulated internally—to a potential investor to induce its investment.  Plaintiff was never provided the Vogel Projections to assess its decision to invest.  *See* ECF No. 56, Scott Aff. ¶ 14(c).  Given the evidence herein, there are triable issues of fact as to whether Singman knew he was making false representations to Scott.  Accordingly, since the elements of the underlying fraud claim have been satisfied, the Court will now turn to the merits of the aiding and abetting claim.

      ii.    Aiding and Abetting Fraud

Defendants aver that even if Plaintiff could prove that Singman committed fraud, they are nevertheless entitled to summary judgment on Count Three because Plaintiff cannot establish that Defendants had actual knowledge of the fraud, nor that they substantially assisted in the advancement of the fraud.  ECF Nos. 53-1, 54-1 at 18-19.  Plaintiff argues that not only did Jacobs know of

Singman's fraud, but "Singman's fraud against [Plaintiff] was orchestrated and directed by Jacobs." ECF No. 55 at 27.  The Court again finds that a genuine issue of material fact exists.  *See Celotex*, 477 U.S. at 323.

A claim of aiding and abetting fraud requires proof of the following elements: "(1) the commission of a wrongful act [the underlying fraud]; (2) knowledge of the act by the alleged aider-abettor; and (3) the aider-abettor knowingly and substantially participated in the wrongdoing." *Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*, 331 F.3d 406, 415 (3d Cir. 2003) (internal citations omitted).  Defendants argue that even if the Court finds element one to be satisfied, Plaintiff cannot satisfy elements two and three.  ECF Nos. 53-1, 54-1 at 18-19.  Defendants maintain that "[t]here are **no** documents or testimony that demonstrate or even infer that Jacobs or Robo thought Singman was committing a fraud."  ECF Nos. 53-1, 54-1 at 19 (emphasis in original).  However, the only evidence that Defendants presented to the Court is an affidavit from Jacobs.  *See* ECF Nos. 53-1, 54-1 at 19.  In it, Jacobs states that "[a]ny information I relayed to Singman were my honest opinions and projections based on my knowledge and expertise."[10]  ECF No. 53-2, Jacobs Aff. ¶ 13; *see Irwin Katz*, 2015 WL 4251156, at *3 (stating that "[t]he fact that some [contrary evidence] . . . appears in, and only in, [defendant's] self-serving testimony is insufficient for Defendants to meet their burden of showing that no genuine dispute of material fact exists on this point") (internal citations omitted).

Nonetheless, Plaintiff has presented enough factual evidence to rebut the notion, thus creating a genuine dispute for trial.  Plaintiff directs the Court to much of the same evidence produced to establish a dispute regarding Singman's alleged fraud.  *See* ECF No. 55 at 27-28.  Sometime in the middle of 2014, it was Jacobs who contacted Singman and informed him that Metro NJ was an "opportunity for investment and restructure."  *See* ECF No. 57-5, Singman Dep. Tr. at 8:5-19.  On

---

[10] Defendants characterize this statement by Jacobs as establishing that he "*whole-heartedly believed* that Metro's finances could be turned around."  Def. SMF ¶ 30.

October 15, 2014, Jacobs sent an email to Singman that included both the "pitch deck" (the same one that listed Jacobs as a board member) and financials of the company; it also stated that Metro NJ needed $500,000.  *See* ECF No. 57-1, Ex. 21.  On December 18 of the same year, Jacobs sent Singman the Jacobs Projections.  *See* ECF No. 57-1, Ex. 23.  The following day, Singman contacted Scott—using the materials sent to Singman by Jacobs—to inform Scott about Metro NJ and how it was a "great investment opportunity" because the company was "about to take off and become highly profitable." ECF No. 56, Scott Aff. ¶ 5; *see also* ECF No. 56, Ex. 1; ECF No. 57-5, Singman Dep. Tr. at 36:2-37:18 (stating that the "pitch deck" and Jacobs Projections were created and sent to him by Jacobs). On December 30, 2014, Scott raised questions about the Jacobs Projections to Singman;[11] Jacobs drafted a response and sent it to Singman, who subsequently directly forwarded it to Scott a few hours later.  *See* ECF No. 56, Scott Aff. ¶ 9; *see also* ECF No. 56, Ex. 3.  In his response, Jacobs described the Jacobs Projections as "conservative" when he knew that they were significantly higher than the Vogel Projections (the projections circulated internally).  ECF No. 56, Ex. 3.  Regardless of whether Jacobs believed Singman would directly forward Scott the response or simply reword it, based on the evidence produced, a reasonable jury could conclude that Jacobs knew that Singman was interacting with Scott about a potential investment, and that he also knew that the information that he was providing to Singman would be given to Scott (in some form) to potentially induce Plaintiff's investment.  This evidence is enough to create a genuine dispute as to whether Jacobs knew and substantially assisted in Singman's alleged fraud.  Accordingly, the motions are denied as to Count Three.

---

[11] It is undisputed that Jacobs and Scott never directly interacted.  *See* ECF Nos. 59-1, 60-1 at 9. However, Plaintiff maintains that Jacobs sent emails to Scott and Plaintiff through Singman.  *See* id.

## V.     <u>CONCLUSION</u>

For the foregoing reasons, the motions for summary judgment are **DENIED** as to Counts Two and Three.  An appropriate order accompanies this opinion.

DATED: January 29, 2021

**CLAIRE C. CECCHI, U.S.D.J.**